IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DALLAS KELLY SHANNON,

    Plaintiff/Counter-Defendant,

v.                                                          No. CIV 02-0717 BB/WDS

THE UNITED STATES OF AMERICA,
*et al.*,

    Defendants/Counter-Plaintiffs.

**PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Plaintiff Kelly Shannon submits his proposed findings of fact and conclusions of law as follows:

**FINDINGS OF FACT**

1. In 1903, a patent was issued by the United States to Patrick G. Worley to approximately 160 acres of land. (Exs. 2, 4). That land, through which the Pecos River runs, is the subject of this litigation.

**The Forest Service Property**

2. In 1938, a survey of part of this land was performed by Ross Engineering. (Ex. 8).

3. The Ross Engineering survey and plat set forth included a specific set of calls and distances. Specific calls and distances, rather than a general meander line, was included for the area that appears to run along the west bank of the Pecos River, in addition to all other parts of the survey's boundary. (Ex. 8). The Ross Engineering survey stated that its survey was of the "Putney Tract on the Upper Pecos River, San

1

Miguel County, New Mexico." (Ex. 8). The survey makes no written reference to the metes and bounds line running along the west bank of the river. (Ex. 8).

4. In 1938, after the Ross plat was completed, the property was placed in receivership and was offered for sale using the following description: "Property on the Pecos River …known as the Putney property and formerly as the Prudencio Gonzales place, being situated in the W1/2 of the W 1/2 and the E 1/2 of the W 1/2 of Section 4, Township 17 North of Range 12 East, and containing a minimum of 159.83 acres, as shown on the survey and plat made by Ross Engineering Office dated May, June and August, 1938." (Ex. 9).

5. It appears that the sale in Ex. 9 did not go through, because in 1942, the receiver transferred to property to another party, again describing the property as: "Property on the Pecos River … known as the Putney property and formerly as the Prudencio Gonzales Place, being situated in the W 1/2 of the W 1/2 and that E 1/2 of the W 1/2 of Section 4, Township 17 North of Range 12 East, and containing a minimum of 159.83 acres, as shown on the survey and plat made by Ross Engineering Office dated May, June and August, 1938." (Ex. 13).

6. The property was deeded to Ralph B. and Viola B. Innis in or about June 1942. (Exs. 16, 17, 18).

7. The receiver reported that the property had been sold and deeded to the Innis' in June 1942, and described the property, in relevant part, as follows:

> …thence S. 38 deg. W. along the West Bank of the Pecos River, a distance of 91 feet to Corner No. 10; thence S. 6 deg. W. along the West bank of the Pecos River, a distance of 261 feet to Corner No. 11; thence S. 12 deg. W. along the West bank of the Pecos River, a distance of 204 feet to Corner No. 12; thence S. 21 deg. W. along the West Bank of the Pecos River, a distance of 386 feet to Corner No. 13; thence S. 13 deg. 20' W.

> along the West bank of the Pecos River, a distance of 285 feet to the Corner No. 14; thence S. 1 deg. E. along the West bank of the Pecos River, a distance of 397 feet to Corner No. 15; thence S. 7 deg. W. along the West bank of the Pecos River, a distance of 267 feet to Corner No. 16; thence S. 3 deg. W. along the West bank of the Pecos River, a distance of 116 feet to Corner No. 17….

(Id.).

8. The order confirming the sale of this property does not provide this description, but once again refers to the survey and plat made by Ross Engineering. (Ex. 17).

9. Comparing the Ross Engineering survey and plat (Ex. 8) with Ex. 17 shows that the calls and distances in Ex. 16 are the same as those shown on the Ross Engineering plat.

10. The receiver's deed dated June 16, 1942 to the Innis' uses the same legal description as was used in Ex. 16. (Ex. 18, Ex. 16).

11. On June 19, 1942, a reimbursement was issued with regard to the expense incurred by Ross to go to Pecos to set the corners. (Ex. 19 at 2).

12. After Innis acquired the property, he erected a fence. (Innis and Cassabonne Testimony). The fence was not used to restrain livestock when it was first erected. (Innis, Cassabonne, Shannon Testimony).

13. The fence was erected on the metes and bounds line set forth in his deed. (Shannon Testimony; Cassabonne Testimony). The fence is still largely visible along the area in which it was first erected in the late 1940s. (Shannon Testimony).

14. Innis instructed his children, visitors, and others that the fence was their boundary line and they were not to go beyond the fence. (Innis and Cassabonne Testimony).

15. The Innis', their children, visitors, and others never crossed the fence line. Innis and Cassabonne Testimony).

16. The Innis daughter, Marilynn Cassabonne, made a drawing of the property in the late 1940s or early 1950s.  The drawing included the fence, which she had been told by her father was the property boundary. (Cassabonne Testimony; Ex. 26).

17. The Innis family was resident on the property every summer from the time they acquired the property until its sale in 1956. (Innis and Cassabonne Testimony).

18. Other than during the summer, with the exception of a caretaker (who sometimes lived on the property and sometimes did not), the Innis property was unoccupied. (Innis and Cassabonne Testimony).

19. To the knowledge of the living Innis family members, the caretaker never crossed the fence boundary. (Cassabonne Testimony; Innis Testimony).

20. Even after the Innis ranch was converted to a "dude" ranch after Ralph Innis, Jr. returned home after World War II, none of the guests were permitted to ride or otherwise use the area to the east of the fence. (Cassabonne testimony).

21. On July 20, 1956, the Innis' quitclaimed the property to the W.C. Kruger Company.  (Ex. 29).  The description contained in the deed was the same as the description used in the conveyance from the receiver to Innis, all of which recited, or used as its basis, the language from the 1938 Ross Engineering Survey of the Putney Tract. (Ex. 29, Exs. 8-9, Exs. 16-18).

22. Around 1968, the United States government apparently re-surveyed the tract, now renamed "Tract 2b". (Ex.33). Although Ex. 33 appears to be the field notes from a

survey, no such survey has ever been provided in response to repeated document requests.

23. While a plat apparently drafted in the late 1960s before the United States acquired the property appears to use the same courses and distances as the Ross Engineering Survey (Ex. 8, Ex. 34), the deed conveying the property from W.C. Kruger Co. to the United states on February 19, 1969, contains slightly different courses and distances. (Ex. 35). See also Ex. 1, Shannon Testimony; expert testimony.

24. However, the deed from Kruger to the United States uses language similar to that in the prior deeds; namely, the use of specific courses and distances, intersecting corners, and the repeated use of the words "along the W. bank of the Pecos River." (Ex. 35 at 1-2).

25. At all material times, the corner of the property now claimed by the United States treated the fence and the metes and bounds description of the Ross Survey as the east boundary of the defendants' property. (Exs. 8, 9, 13, 14, 16, 17, 18, 19, 23, 24, 29, 34, 35).

## The Shannon Property

26. The land owned by Putney included property on the east side of the Pecos as well as on the west side. (Ex. 11). That parcel was also conveyed to a receiver. (Ex. 11). That parcel was generally described as "The following real estate, situate in said county and state, to-wit: E 1/2 of SW 1/4 Section 4 TWP 17, Range 12." (Ex. 11). See also Ex. 10.

27. In 1940, the receiver conveyed this land to Gant, with several additional descriptions, including the notation that the parcel of land was "bounded on the west by the Pecos River." (Shannon Testimony; expert testimony).

28. On April 6, 1944, quitclaimed to a new purchaser, D.M. Daugherty, the following property:

> A parcel of land bounded on the West by the Pecos River, and all land contained East of the Pecos River and within the limits of the East Half of the Southwest Quarter (E 1/2 SW 1/4), Section 5, Township 17 N., Range 12 E., N.M.P.M.....

(Ex. 20, 21).

29. After Daugherty acquired this property, he filed suit against his neighbor on the other side of the river, Innis, with regard to a portion of Daugherty's property to the south of the contested area. The litigation resulted in a successful adverse possession claim and settlement in favor of Innis transferring that piece of property to Innis. (Shannon Testimony).

30. Following this litigation, Innis erected a fence around the area of property he had just acquired in the litigation. The fence was built north of the recently litigated property and through the area in dispute in this litigation. (Shannon Testimony).

31. The fence was built sometime in 1948, after the litigation commenced, but before Daughtery sold his property to Shannon's father in November 1948. (Shannon Testimony).

32. Daugherty, a licensed surveyor (State of New Mexico Custodian of Records; Exs. 22, 27), re-drew the plat originally drawn by Ross, adding in notations as to the placement of the newly erected fence line. (Ex. 24).

6

33. On November 23, 1948, Daugherty sold his property to Shannon's father and another family. (Ex. 25). While Daugherty's description in the deed referred to the "center of the Pecos River" as the boundary of the property, Daugherty informed the elder Mr. Shannon that the property might very well extend to the fence on the opposite side of the river, but that Mr. Shannon may have to litigate that issue. (Shannon Testimony).

34. The other owner of the property conveyed his interest in it to the elder Mr. Shannon on June 7, 1951. (Ex. 28).

35. Mr. Shannon told his family, guests, and others that the fence was the boundary between the properties and told them not to cross the fence line. (Shannon Testimony, Tribble Testimony).

36. The Shannon family and their guests fished the entire river and used the west bank of the Pecos up to the fence line. (Shannon Testimony).

37. The Shannons at all material times treated the said fence as the boundary between the properties. (Shannon Testimony).

38. In 1974, the elder Mr. Shannon deeded the property to the plaintiff. (Ex. 37).

### **Later Events**

39. Plaintiff in this case, his family and guests, have used both sides of the river from the time he first came to the river in 1948, through this litigation. (Shannon Testimony). They fished from it, put up temporary structures in the river on both the east and west sides, and always instructed any trespassers on both the east side and the west side beyond the Fence Line that the area was private property owned by the Shannon family. (Shannon Testimony).

40. Plaintiff also obtained permission from both the State of New Mexico and the United States Army Corps of Engineers to erect log structures in the River.  These structures went beyond the centerline of the River.  (Exs. 39, 40; Shannon Testimony).

41. After plaintiff erected additional structures and was asked to obtain approval from them after the commencement of this litigation, plaintiff submitted an "after the fact permit application," which was approved by the United States Army Corps of Engineers. (Exs. 55-57, 59, 61 Shannon Testimony).

42. In the 1990s, plaintiff noted that the number of individuals trespassing from Forest Service property onto his private property.  As a result, he erected "no trespassing, private property" signs.  (Shannon Testimony). The signs remained on the fence for years.  (Shannon Testimony).

43. In 1998 or 1999, after the signs had been up for many years, Forest Service representative Wilford Varela asked Shannon in May 1999 to take down his signs.  In their place, the Forest Service agreed to post its own on the fence line warning that the land beyond the Fence Line to the east was private property.  (Shannon Testimony; Exs. 42-44).

44. On February 4, 2000, after meeting with plaintiff and reviewing various documents, Santa Fe National Forest Registered Land Surveyor Garland Burnett wrote a memorandum to Dan Crittenden, the District Ranger, opining in part with regard to the United States' boundary: "The United States riparian boundary is the west bank; mean high water, of the Pecos River.  Accordingly …. [i]f asked to locate the property of the United States I would interpret the title line to be the mean high water mark of the West bank of the Pecos River."  (Ex. 45).

45. Based upon the belief that the neither the United States nor plaintiff "appear to have title to any lands between the center line of the Pecos River and the west bank of the Pecos River," (Ex. 45 at 5), the Forest Service correctly posted "no trespassing" signs on the fence.

46. The first written notice received by plaintiff of the Forest Service's claim that it owned all of the area from the fence line to the middle of the Pecos River is a letter written on April 30, 2002, from the acting district ranger.  (Ex. 47; Shannon Testimony).

### Expert Testimony

47. The language in the deed conveying the Forest Service property from the receiver to Innis came from the Ross Engineering Survey of the Putney Tract.  (Ex. 8, Exs. 14-18).

48. The Ross Engineering Survey never uses the words "along the west bank of the Pecos River."  (Ex. 8).

49. The Court conveyed to the receiver the land as set forth in the Ross Engineering survey.  (Ex. 8, 14, 15).

50. There is no language in any of the deeds (or in the Ross Survey) referring to a "meander line" or a "meander corner."  (Exs. 8, 18, 29, 35).  Rather, each of these deeds details specific courses and distances, along with specific intersecting corners.  Id.

51. In his report, defense expert Chris Chavez refers to the work entitled *Boundary Control & Legal Principles*.  In that work, a "corner" is defined as "The point of change of direction of a land boundary." (Robillard Testimony; Exs. 62-64).  By using the word "corner," along with specific courses and distances, and along with the words

"along the west bank of the Pecos River," the original surveyor intended that the course and distance line along the bank of the River constitutes a "boundary." (Id.).

52. This controlling treatise, relied upon by the defense expert, notes the difference between the verbiage "along the river" (a call to the centerline) and "along the bank of the river" (a call to the river's bank). At page 376, the treatise defines the "term" along by noting: "…'along the road' means the centerline or thread of the road <u>unless qualified</u> as, for example, 'along the east side of the road.'" (Id.).

53. The defense expert incorrectly relied upon the surveying manual issued by the federal Bureau of Land Management. He is aware that using the BLM manual in this case is incorrect as set forth in the New Mexico rules for surveyors. (Robillard Testimony; Doak Testimony, Exs. 62-67).

54. Further, the defense expert cites to the Brown treatise with regard to the use of the order of calls. However, the order of calls applies only if there are conflicting elements contained within a deed. Here, there is no conflict because the deeds refer to a specific metes and bounds line that is along the west bank of the river. (Robillard Testimony; Doak Testimony; Exs. 62-64).

55. Even were there a conflict, the survey controls over a natural monument. The defense expert admits this by saying that the "west bank" is the eastern boundary of the Forest Service property. This reference to the west bank as the boundary is the same conclusion reached by former senior surveyor Garland Burnett, who concluded that the United States owned only to the west bank (not to the centerline) of the river. (Robillard Testimony; Doak Testimony; Exs. 3, 45, 62-63).

56. The Burnett letter, which was hidden from plaintiff and learned of only from Burnett himself rather than through the United States, upon which an appropriate document request was served, demonstrates why the United States erected its own "no trespassing" signs. (Shannon Testimony, Ex. 45, Exs. 62-65, 67).

**Defendants' Counterclaims**

57. Shannon owns both sides of the Pecos River at points other than the disputed area. (Shannon Testimony). He receives some income from allowing fishermen to practice "catch and release" fishing in the river, largely in the non-disputed area. Id.

58. Shannon is a steward of the river, erecting largely natural structures in the river in order to enhance the habitat. (Shannon Testimony).

59. The U.S. Army Corps of Engineers has approved his use of the river and has determined that it is not incompatible with federal law and regulation (Shannon Testimony; Ex. 61).

60. The United States did not object to Shannon's use of the river in the disputed portion, or assert its ownership, until late 1999 (verbally) and 2002 (in writing). (Shannon Testimony, Ex. 47).

61. At no time has Shannon ever believed that he has fished or otherwise encouraged others to fish or use National Forest Service land. (Shannon Testimony).

62. The United States has never informed Shannon of any need to obtain a permit for catch and release fishing. (Shannon Testimony). The United States has been aware that Shannon permits catch and release fishing on the river since at least the 1990s. (Shannon Testimony).

63. Shannon's actions have not damaged the United States, but instead have enhanced the habitat on the Pecos River. (Shannon Testimony; Ex. 61).

## CONCLUSIONS OF LAW

### General Legal Conclusion

1. The Court has subject matter and personal jurisdiction over the parties. Venue is proper in this district.

2. The language of the deeds of conveyance in the Forest Service's chain of title are unambiguous and set for the metes and bounds line as the boundary of its property, which exclude the river. 11 C.J.S. Boundaries, § 30 at 87. ("definitely and specifically" binds the "conveyance by the bank of the stream that no process of interpretation will carry title to the center of the stream"); 12 Am.Jur.2d Boundaries § 24 (where conveyance "runs the boundary along the bank or shore of a river, land under water is excluded from the conveyance"). *See also Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co.*, 13 Haw. 583, 584 (Haw. 1901) ("one who owns land to the centre of a stream or inclusive of the whole stream may convey to another the portion of such land extending to the bank only and exclusive of the bed of the stream").

3. The original fence was erected along the metes and bounds line of the Forest Service property.

4. The terminology "along the west bank of the Pecos River," is a call requiring a finding that the intention of the original grantor was to establish the metes and bounds line along the bank of river, not the centerline of the river, as the property boundary. (*See, e.g.*, 12 Am. Jur. 2d Boundaries §§ 24, 25; *Maestas v. Martinez*, 107 N.M. 91, 752 P.2d 1107 (1988); *Burnham v. Group One: City of Farmington*, 125 N.M. 129, 957 P.2d

1163 (Ct. App. 1998)). *See also Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co.*, 13 Haw. 583, 584 (Haw. 1901).

5. The call "to the center of the river" on the Shannon side of the property was added by later grantors and was not intended to convey less than the grantor owned.

6. The Shannon and Innis properties were both owned, prior to Innis and Daugherty's acquisitions, by a single owner.

7. The U.S. admitted through Garland Burnett that the Forest Service "bought to the fence," and not to the river. As a result, either the land from centerline to the fence belongs to Shannon, or it is unconveyed remnant. *See, e.g,* Fed. R. Evid. 801(d)(2) (admission by party-opponent); *Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co.*, 13 Haw. 583, 584 (Haw. 1901).

8. As it is the United States that has sought, by way of counterclaim that it owns from the centerline of the river to the river's west bank, the U.S. is in the position of a plaintiff with regard to the counterclaim. "It is sufficient to conclude that the plaintiffs [in this case, counterclaimants] have not established title to any of the parcel allegedly taken" by Shannon. *Amaliksen v. United States*, 55 Fed. Cl. 167, 174-175 (Ct. Claims 2003). In the event the Court determines that there is an unconveyed remnant, the Court need not ascertain to whom the property belongs.

9. The Forest Service has unreasonably withheld documents during the discovery phase of this litigation. Its conduct is subject to monetary and other sanctions.

### Boundary by Acquiescence and Quiet Title

10. There is no necessity to prove that there is any dispute between the parties as to the boundary for the boundary by acquiescence doctrine to apply. *See Sproles v.*

*McDonald*, 70 N.M. 168, 372 P.2d 122 (1962); *Retherford, v. Daniell*, 88 N.M. 214, 539 P.2d 234 (Ct. App. 1975). *See also Woodburn v. Grimes*, 58 N.M. 717, 275 P.2d 850, (1954) ("doubt, uncertainty, or dispute as to location of true boundary is not essential in a boundary-by-acquiescence case…").

11. Even if Innis and Shannon each owned up to a clear and certain line, a fence was built off of that line, and the fence rather than the land listed in the deed becomes the boundary by acquiescence. *See Sproles v. McDonald, supra; McBride v. Allison*, 78 N.M. 84, 428 P.2d 623 (1967); *Retherford v. Daniell, supra; Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712 557 P.2d 209 (1976).

12. The Innis family, and thereafter the Kruger Company, agreed (expressly and implicitly) that the true boundary of their property was the fence line that lay on the west side of the Pecos River. The fence was the clear and certain dividing line and was mutually recognized as the boundary between the properties. (*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

13. The fence erected by Innis was recognized as the dividing boundary between the parties. Both Innis and those later in his chain of title, and Shannon and those earlier in his chain of title, knew of the existence of the fence from around 1948 on, establishing the boundary by acquiescence. (*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

14. The fence, which was erected after litigation over property boundaries, was intended to provide a barrier between the properties. When the fence was first erected, there was little or no livestock for it to restrain. (*Tresemer v. Albuquerque Public School Dist.*, 95 N.M. 143, 619 P.2d 819, 820 (N.M. 1980); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 557 P.2d 209 (N.M. 1976)).

15. Both Innis and Shannon knew of the establishment of the fence as the line of property demarcation, both assented to this as the boundary line, and both instructed their family members, guests, invitees, and others that the fence marked the boundary between the properties. (*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

16. The fence formed the boundary between the parties by acquiescence from at least 1948 through the time of the Forest Service's purchase of the property in 1969. (*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

17. Plaintiff has established that the boundary of his property is the fence line. (*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

18. Title shall be quieted in plaintiff to the area between his current property boundary and the fence line, which runs along the metes and bounds line set forth in the 1938 Ross Engineering Survey of the Putney Tract.

19. Evidence of how the Forest Service treated the boundary is relevant to the issue, and shows lack of ambiguity as to the boundary.  *Se, e.g., C.R. Anthony Company v. Dartford Company*, 112 N.M. 504, 817 P.2d 238 (1991); *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 845 P.2d 1232 (1993); *Twin Forks Ranch, Inc. v. Brooks*, 120 N.M. 832, 907 P.2d 1013 (Ct. App. 1995).

### Constitutional/Injunctive Claims

20. Plaintiff has established that his boundary is the fence line between the properties.

21. Defendants shall cease and desist from interfering with plaintiff's right to use the area up to the fence line.

22. Defendants shall not use the area beyond the fence line and shall post signs warning defendants' invitees and others that the area beyond the fence line is private property and that they cannot trespass in the area or otherwise interfere with plaintiff's property rights.

### Counterclaims

23. Because defendants have been aware of plaintiff's contentions that he owns the area to the fence line, have erected their own "no trespassing" signs accepting the fence as the boundary, and because defendants have acquiesced in plaintiff's claim that he owns to the fence line, their counterclaims are barred by estoppel.

24. Because defendants failed to take any affirmative action to demonstrate that they own the area beyond the fence line, placed their own "no trespassing" signs on the fence line, and have not either utilized the area beyond the fence line nor stopped plaintiff from using the area beyond the fence line since 1969, their claims are barred by laches.

25. The Ross Survey establishes that the original survey was set forth in courses and distances only and did not make any reference to the boundary being along the west bank of the Pecos River. Therefore, the grantor did not intend to convey to Innis the property from the centerline to the west bank of the river. *See, e.g., In re Kelley*, 50 Haw. 567, 577 (Haw. 1968) ("Following the rule in *Wailuku Sugar* that where it appears from a deed and other evidence, that the intent of the grantor was to convey only as far as a monument and not including it, we conclude that the deed of 1885 excluded the road").

26. Defendants do not own the area from the west bank of the river to the centerline of the river.

27. Defendants do not own the area from the centerline of the river to the fence line.

28. As defendants do not own the area from the centerline of the river to the fence or to the west bank of the river, they have no claim for trespass or other unlawful or unapproved use of the entire river.

29. Even had defendants owned the area from the fence to the centerline, defendants have failed to prove that they have been damaged by plaintiff's actions.

30. Further, defendants failed to prove that a license or application was required by plaintiff to permit catch and release fishing in the Pecos River or that any of the catch and release fishing occurred in any part of the river that is not owned by plaintiff.

## Costs and Fees

31. Plaintiff is entitled to recover his attorneys' fees spent in prosecuting this action pursuant to the Equal Access to Justice Act, 42 U.S.C. § 1988.

32. As the prevailing party, plaintiff shall be permitted to recover the costs incurred in prosecuting this action pursuant to 28 U.S.C. § 1920, *et seq*.

                              SIMONS & SLATTERY, LLP

                              By:   <u>Electronically signed by Faith Kalman Reyes, April 25, 2005</u>
                                     THOMAS A. SIMONS, IV
                                     FAITH KALMAN REYES
                                     Post Office Box 5333
                                     Santa Fe, New Mexico  87502-5333
                                     (505) 988-5600

### **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 25, 2005, a copy of the foregoing sent via first class United States mail, postage prepaid, to the following attorney of record:

Raymond Hamilton
Assistant U.S. Attorney
Post Office Box 607
Albuquerque, New Mexico  87103

                <u>Electronically signed by Faith Kalman Reyes, April 25, 2005</u>