**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**DALLAS KELLY SHANNON,**

   **Plaintiff/Counter-Defendant,**

**v.**            **No. CIV 02-0717 BB/WDS**

**THE UNITED STATES OF AMERICA,**
***et al.,***

   **Defendants/Counter-Plaintiffs.**

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW (POST-TRIAL)**

Following the trial in this matter, plaintiff Kelly Shannon submits his proposed findings

of fact and conclusions of law as follows:

**FINDINGS OF FACT**

1. Plaintiff Shannon owns land on the Pecos River near Terrero, New Mexico.  Shannon

obtained this land by deed from his father, Lyle "Mike" Shannon.  Mike Shannon, along with

another couple, had purchased the property in 1948 from its former owner, David M. Daugherty.

(TR 73-74, Shannon Testimony; TR 203, Tribble Testimony).

2. The U.S. Forest Service purchased its property, located across the Pecos River from

Shannon's property, in 1969 from the Kruger Company.  (Ex. 35).  Kruger had purchased the

property in late July 1956 from its prior owner, R.B. Innis.  (Ex. 29).  Innis purchased the

property, which had been held in receivership, in 1942 from the receiver, Williams.  (Ex. 18).

*See generally* TR 89 (Shannon Testimony).

3. In 1938, both the tract later owned by Innis and that later owned by Shannon were

conveyed in a single deed by the San Miguel County Treasurer to the State of New Mexico as

1

the result of unpaid taxes.  A single tax deed was issued by the State of New Mexico conveying the same property to the receiver, Williams.  (Exs. 11, 11A, 11B).

4.   The tax deeds, both into and out of the state, conveyed the property on both sides of the river to a single entity, the receiver.  (TR 234-235, Doak Testimony).   Any deeds that separately conveyed property on either side of the river became irrelevant after the tax deed merged the title.  (TR 234-235, Doak Testimony).  As a result, the first relevant deed in the chain of title was the deed conveying the property at issue from the receiver, Williams, to Innis.  (TR 235, Doak Testimony; Robillard Dep. 48).  This testimony is unrebutted.

## Facts Establishing Boundary by Acquiescence

## The west side of the river

5.   The Innis family spent the entire summer on the property beginning in 1942, when the property was obtained.  (TR 166, Casabonne Testimony).

6.   At the time the property was purchased in 1942, there was already a fence running along the west bank the Pecos River.  (TR 165-166, Casabonne Testimony).

7.   At all times, the Innis family and guests treated this fence as the boundary of the Innis property.  (TR 165, Casabonne Testimony).  *See also* TR 176-177, Casabonne Testimony.

8.   Both Marilyn Casabonne (the daughter of R.B. and Viola Innis) and Helen Innis (the wife of R.B. and Viola Innis' son) never crossed the fence line, nor saw anyone else do so.  (TR 165, Casabonne Testimony; TR 193-194, Innis Testimony).

9.   Casabonne testified she did not cross the fence line because her father told her it was the boundary of their property.  (TR 163, Casabonne Testimony):

   Q.   And where was the eastern boundary of your property, the one that heads toward the river, where was the eastern boundary?
   A.    Along the fence, except here where -- which was the original piece of property that we owned.  It went across the river and up the hill a little bit.

....
Q.   And, Mrs. Cassabonne, you testified that the property ended at the fence line just before the river, correct?  Above the barn, I'm sorry.
A.   Above the barn, yes, that was my thought that the property ended there, did not go to the river or across it.
Q.   And how did you reach the thought that the boundary ended at that fence line?
A.   I just respected fence lines.  And my dad told me that that was the boundary of the property.  (TR 163).

10. Innis testified she did not cross the fence line because her husband or father-in-law

(or someone else), told her it was the boundary of their property:  (TR 186 -188, Innis

Testimony)

Q.   Mrs. Innis, did you have any understanding as to whether there was something that showed the public as to where -- showed your guests where the boundary was? ....
A.   The fence, yes.
Q.   ....And how did you reach the understanding that the fence was the boundary?
A.   Well, apparently, my husband told me or his father told me or somebody told me, and I checked with Marilyn to see if she felt the same way, and she said yes, she did.....So we just figured that was the boundary always, wherever there was a fence, and that's what I  taught my kids, anyway....
Q.   You taught your kids that that was the boundary as well?
A.   Yes, don't go outside the fence, because that belongs to somebody else....
Q.   So you treated that fence as the boundary?
A.   Oh, yes.
Q.   Do you know of any person or anybody at any time who didn't treat that fence as the boundary?
A.   No, not that I know of.....
Q.   Do you recall whether the fence was there when you returned to live there in, I think you said 1945, 1946?
A.   Yes, it was there, and I toured the property very carefully.

11. Mrs. Casabonne testified that guests were not allowed to fish in the area beyond the

fence along the west bank, because that part of the river "didn't belong to us."  (TR 167-168,

Casabonne Testimony).

12. When Innis owned the property, there was no break in the fence or any other means

for horses to be able to drink from the river.  (TR 166, Casabonne Testimony; TR 191, Innis

Testimony).  The horses could instead drink from a ditch near the northern edge of the property. (TR 189-191, Innis Testimony).

13. It is uncontested that the property on the east side of the river belonged to Shannon to the river's centerline.  (Pretrial Order).

14. In addition to the fence existing along the west bank of the river, there was a fence belonging to Innis that actually crossed the river (the "south fence").  This fence was located near the Innis' barn.  (TR 164-165, Casabonne Testimony.  *See also* TR 81-83, Shannon Testimony).

15. There was no gate in either the fence along the west bank of the river or in the south fence.  (TR 81, 83, 101-102, Shannon Testimony; TR 188, Innis Testimony).

16. In the late 1940s or early 1950s, Mrs. Casabonne drew a picture of the Innis property (along with the surrounding area).  Mrs. Casabonne based this picture, Exhibit 26, upon maps of the area, along with her knowledge of the Innis property.  (TR 160-161, Casabonne Testimony).

17. The picture, which is an accurate representation of the property at the time it was drawn, reflects both the fence along the west bank of the Pecos river and the south fence that crossed the river.  (Ex. 26; TR 161, 165, Casabonne Testimony).

18. The Innis family treated the eastern boundary of the Innis property as running along the fence near the west bank of the Pecos River.  (TR 163, Casabonne Testimony; TR 186-187, Innis Testimony).

19. Until the Innis family began a guest ranch after Ralph Innis, Jr. returned from service in World War II (TR 182-183, Innis Testimony), the family had just three or four horses on the property.  (TR 189, Innis Testimony).

20. Mrs. Innis lived on the property all year around for about five years from 1945 through 1950 or 1951.  (TR 182, Innis Testimony).  Prior to that time, she visited the property every summer beginning in 1943.  (TR 181-182, Innis Testimony).  Mrs. Casabonne lived on the property every summer from about 1937 until about 1954.  (TR 166, Casabonne Testimony).

21. When the Innis family opened its guest ranch in the early 1950s, guests were expressly informed that they were permitted to fish only in the river to the south of the southern fence.  They were informed that the area along the west bank of the Pecos river was beyond the Innis' boundary.  (TR 192-193, Innis Testimony; TR 167-168, Casabonne Testimony).

22. Mrs. Innis testified (TR 192-193):

Q:  And what did you tell them about where they could fish?
A.  Well, they couldn't go past the fence that went across the river at the barn and they could go down here past the main house as far as they wanted to.
Q.  And why couldn't they go past the fence that crossed the river?
A.  Because that was somebody else's property.

23. Mrs. Casabonne and Mrs. Innis both testified that guests were not permitted to ride horseback without a guide.  Mrs. Casabonne and Mrs. Innis were both trail guides, and both testified that guests were never taken for a ride along the west bank of the Pecos river in the area of the fence.  (TR 169, Casabonne Testimony).

24. Neither Mrs. Innis nor Mrs. Casabonne ever saw or heard of anyone crossing the fence that ran along the west bank of the river.  (TR 165-166, 169, Casabonne Testimony).

25. Mr. Innis, Sr. was an honest and upright businessman.  (TR 172-173, Casabonne Testimony).  He took boundaries seriously and told his children never to cross them.  (TR 169-170, Casabonne Testimony).  Innis told his children that the fence that ran along the west bank of the Pecos River was the boundary of their property on the east. (TR 163, Casabonne Testimony). *See also* TR 197, Innis Testimony (testifying that Ralph Innis, Sr. was an honest person, "And he

was very, very careful about every detail.  His property was his property, and he paid really close attention to that").

26. Innis sold the property to Kruger in July 1956.  (Ex. 35).

27. Shannon's friend Bob Tribble would often accompany Shannon to their property on the Pecos River.  Tribble was aware that the boundary of the Innis property was the fence along the west bank of the river. (TR 208-211, Tribble Testimony).

28. One day in the summer of 1956, Tribble ran into a school acquaintance, Karl Kruger (son of the property's owner).  (TR 211, Tribble Testimony).  Karl was in the river, near the bank on the west side.  (TR 212, Tribble Testimony).  Tribble approached Karl and asked him if he knew that he was trespassing.  Karl acknowledged his awareness that the property was not his, and asked Tribble if Tribble thought Mike Shannon would be interested in negotiating fishing rights so that Kruger could fish all the way up the Pecos (including the area in which Karl was then standing), and Shannon could fish all the way down the Pecos (at and past the area of the south fence).  (TR 214-216,Tribble Testimony).

29. Karl's statement about knowing he was trespassing, and his interest in exchanging fishing rights, were admissions that Kruger and his family treated the fence along the west bank of the river as their property boundary.

30. Karl was never seen trespassing on the river again.  (TR 216, Tribble Testimony).

31. Gonzalo Varela, who was a visitor while his father worked on the Innis property for a few years from about 1952 until 1955, testified that he had no idea where any property boundaries were located, and "Legal or illegal, I had no knowledge or who belonged to what, no." (TR 440-441, 448-449 Varela Testimony).

32. Varela testified that his father and Innis guests routinely trespassed on Shannon's acknowledged property on the east side of the River. (TR 445-447, Varela Testiomny). Further, he testified the guests routinely trespassed on the road that belonged to Shannon to access the river. (TR 444-445, Varela Testimony; TR 80, Shannon Testimony [establishing road belonged to Shannon]).

33. Varela testified that he never saw anyone climb a fence, yet also testified that the guests would fish the river and then walk back to the area on the Innis property below the barn (TR 451-452, Varela Testimony), which would have been impossible because the fence in existence (as reflected on Exs. 24 and 26, contemporaneous documents showing the fence), would have prevented passage.

34. Varela did not recall the fence on the south side, which would have made such a walk impossible without jumping the fence. (TR 453-454, Varela Testimony; TR 81-83, Shannon Testimony [establishing existence of fence crossing the river on the Innis south boundary]; TR 193, Innis Testimony [in response to question asking if someone wanted to go past the fence on the south the crossed the river, Mrs. Innis testified: "they'd have to climb the fence…"]). *See also* Exs. 24 and 26, contemporaneous documents showing the fence.

35. Varela testified that the fence separated two pastures, and only at that point ran north along the river. He did not testify to any fence below the area separating the two pastures on the east side of the river. (TR 417-418, Varela Testimony).

36. Varela, who was not on the property when the fence was erected, could only testify to the current use of the fence as a livestock barrier. (TR 417-418, 455-456, Varela Testimony).

37. Varela was aware of the existence of water gaps in the 1950s, but because he was not there until the 1950s, he could not testify as to the fence's earlier condition.  (TR 420-421, 455-456 Varela Testimony).

38. Prior to the acquisition of the property by the USFS, Varela was last on the property in the mid 1950s, when he was 18.  (TR 439, Varela Testimony).

39. Mrs. Innis testified that she "toured the property very carefully" in 1945 or 1946; that the fence was in existence at that time; and there were no breaks or other places in the fence that would allow livestock to drink from the river at that time.  (TR 188, 191, Innis Testimony).

40. Mrs. Innis also testified that "we watched our people pretty close.  They fished up to the barn and back down the other end, or they could go fish in the public, you know, places on the river."  (TR 199, Innis Testimony).

41. Varela, who has worked in this area as a Forest Service employee for over 40 years, did not testify as to any occasion during that employment on which any one ever crossed the fence that ran along the west bank of the Pecos River.  (TR 457, Varela Testimony).  No other witness testified that the owner of the property (or the owner's authorized agents) of the disputed tract (including the Forest Service) ever actually went beyond the fence on the west bank of the river.

**The east side of the river**

42. With the exception of two years when he was in the armed services (1956 and 1957), Shannon spent at least every summer weekend on his family's property.  His time at the property increased after he moved back to New Mexico after college, and increased even more when he had children.  Since his retirement in 1991, Shannon has spent even more time on the property. (TR 75-77, 62 Shannon Testimony).

8

43. During the summer of 1952, Shannon and two friends spent almost the entire summer on the river. (TR 210, Tribble Testimony).

44. Shannon's father told him that the boundary of their property was the fence along the west bank of the river, a rule which Shannon, his family, and guests honored.  (TR 99-102, Shannon Testimony).

45. Shannon's father also told Shannon's friend, Bob Tribble, the first time that Tribble visited the property that Tribble could not go beyond the fence because that was the boundary line of the Shannon property.  (TT 208-209, Tribble Testimony).

46. Shannon spent a lot of time on both sides of the river.  His activities on the river's west bank included fishing, hiking, building dams, collecting wood and rocks, inner tubing, fixing fence, picnicking, hunting, searching for bait, and the like.  (TR 74-78, 84-87, Shannon Testimony; TR 209-210, Tribble Testimony).

47. Shannon never saw any Innis or Kruger family member or guest cross the fence line. (TR 87-88, 91-93 Shannon Testimony).

48. The only individuals Shannon has ever seen on the west bank of the river were trespassers, who trespassed on both sides of the river's centerline.  *See, e.g.,* TR 105-106, Shannon Testimony.

## Boundary by acquiescence/statute of limitations[1]

49. Understanding that he owned to the fence line, beginning in the 1970s, Mike Shannon erected signs on the fence warning that the land beyond the fence was "private property/no trespassing/no fishing/no hunting."  (TR 104-106, Shannon Testimony).

---

[1] The US contends that Shannon's complaint was untimely.  This is belied by the US' recognition of the fence as the boundary until about 2000.  If the US was unaware of its alleged claim to the west bank of the river, how could Shannon have been so aware?

50. Likewise, in 1995 and later in 1999, Shannon erected similar signs on both the fence and on the road leading to the USFS property. (TR 106-110, Shannon Testimony).  The latter sign was erected with USFS permission.  (TR 109, Shannon Testimony).

51. In 1999, the USFS notified Shannon that because *the fence* was Forest Service property, he would have to remove his signs.  (TR 112-114, Shannon Testimony).  The USFS offered to post its own signs on the fence noting "no trespassing" beyond the fence line. Shannon accepted the USFS offer, and the USFS posted these signs.  (Exs. 44, 46).

52. Shannon removed his signs from the fence and attached them to trees and posts on the west bank of the river.  (TR 112-114, Shannon Testimony; Exs. 44, 46).

53. The USFS regional land surveyor agreed with Shannon that the USFS owned only up to the fence line.  (TR 117-118, Shannon Testimony; Ex. 45).  In fact, as set forth above, the Forest Service itself still is not sure what its boundary is:  Chavez testified that the boundary is the west bank of the river (but that somehow, the U.S. nevertheless owns to the thread); Simpson testified the boundary is the medial line of the river; Burnett wrote in a memo that the boundary is the west bank based upon his interpretation of deeds and application of various surveying treatises, and now has another opinion (though the same deeds and treatises continue to apply). Since the U.S. is not certain what it owns, and because it too has recently asked the Court to establish its boundary line, a statute of limitations could not have already run on Shannon's claim.

54. The USFS asked Shannon to remove his signs because they were on the fence, but did not tell Shannon that the USFS owned the land beyond the fence.  (Ex. P(3); TR 153-155, Shannon Testimony).

**The USFS Boundary is the West Bank of the Pecos River**

55. The deed from Innis to Kruger, and then from Kruger, to the United States contains various calls and distances; calls to a corner; and notations that the calls and distances are "along the west bank of the Pecos River."  (Exs. 18, 35, 56).

56. The question remaining for determination is whether the boundary of the U.S. property is along the west bank, as set forth in the deed, in the expert report of Chris Chavez, in the opinion letter of Garland Burnett, and in other various places.

57. As set forth above, Innis obtained the property at issue via a receiver's deed.

58. In May, June, and August 1938, a survey was conducted and a plat was drawn of the "Putney Tract," by Ross Engineering.  (Ex. 8).  The Putney Tract shown included the area of dispute in this litigation (Ex. 8).  The Ross Engineering survey reflected a "total area = 159.63 acres."  (Ex. 8).

59. On May 9, 1942, the receiver petitioned the court to sell a parcel described as:

> Property on the Pecos River in San Miguel County know as the Putney property and formerly known as the Prudencio Gonzales Place, being situated in the W 1/2 of Section 4, Township 17 North of Range 12 East, and containing a minimum of 159.63 acres, as shown *on the survey and plat made by Ross Engineering Office, dated May, June and August, 1938*.

(Ex. 13, emphasis added).

60. On that same day, the court granted the order to sell real estate, describing the property to be sold using the same language quoted above from the petition for leave to sell real estate.  (Ex. 14).

61. On June 15, 1942, the receiver's deed was signed.  The property was described in part as follows:

> …thence N. 39 deg. 07' E. a distance of 1236.3 feet to Corner No. 8; thence S. 21 deg. 55' E. a distance of 622.9 feet to Corner No. 9; thence S. 38 deg. W. along

the West Bank of the Pecos River, a distance of 91 feet to Corner No. 10; thence S. 6 deg. W. along the West bank of the Pecos River, a distance of 261 feet to Corner No. 11; thence S. 12 deg. W. along the West bank of the Pecos River, a distance of 204 feet to Corner No. 12; thence S. 21 deg. W. along the West Bank of the Pecos River, a distance of 386 feet to Corner No. 13; thence S. 13 deg. 20' W. along the West bank of the Pecos River, a distance of 285 feet to the Corner No. 14; thence S. 1 deg. E. along the West bank of the Pecos River, a distance of 397 feet to Corner No. 15; thence S. 7 deg. W. along the West bank of the Pecos River, a distance of 267 feet to Corner No. 16; thence S. 3 deg. W. along the West bank of the Pecos River, a distance of 116 feet to Corner No. 17….

(Ex. 18).

62. On that same day, June 15, 1942, the receiver reported the sale to the Court using the same description as was contained in the receiver's deed, Ex. 18.  (Ex. 16).

63. Yet, in the Order Confirming Sale, the Court noted that the receiver delivered to the purchaser "a good and sufficient deed to the following described property situate in San Miguel County, New Mexico, to-wit:

> Property on the Pecos River in San Miguel County know as the Putney property and formerly known as the Prudencio Gonzales Place, being situated in the W 1/2 of Section 4, Township 17 North of Range 12 East, and containing a minimum of 159.63 acres, as shown on the survey and plat made by Ross Engineering Office, dated May, June and August, 1938.

(Ex. 17).

64. This documentation establishes that the Williams to Innis deed was based upon the actual Ross Engineering survey.  (TR 234-236, Doak Testimony; TR 370, Simpson Testimony). There is no indication in the survey that this land goes to the center of the river.  (TR 244, Doak Testimony).  Chavez alone disagreed, but testified that had the survey been used to interpret the deed, "it would be significant and it would be used more significantly."  (TR 230-231, Chavez Testimony).

65. In the event of ambiguity, the first method for construing the deed is to examine the "call for a survey or an actual survey on which the conveyance is based."  (TR 339, Chavez

12

Testimony; Robillard Dep. 63-64).  The deed in this case is not ambiguous.  *See, e.g.*, TR 342, Chavez Testimony; TR 370-371, Simpson Testimony.

66. Each of the experts uniformly testified that the priority of calls doctrine applies only where a deed is ambiguous.  (TR 338-339, Chavez Testimony; TR 370-371, Simpson Testimony; TR 248-249, Doak Testimony; Robillard Dep. 66-67).

67. As Max Doak testified, the deed in this case is not ambiguous because each of the parts of the deed can be read together:  the calls and distances are, as stated in the deed, placed on the ground "along the west bank of the river."  Further, the deed calls to specific corners, were relevant, which are along the west bank of the river.  The corners to which the calls and distance are run are not "the river," and are instead at a distance from the river itself.   These corners and the metes and bounds are, in fact, "along the west bank of the river."  (Ex. 62 at 3; TR 233, 242-244, 247-249, Doak Testimony). *See also* TR 330-331, 343, Chavez Testimony (the metes and bounds ran along the west bank of the Pecos river in 1942).  Walt Robillard is in accord.  (Robillard Dep. 48-50).  As Walt Robillard explained, there is no conflict between the metes and bounds and the statement "along the west bank"  "because the west bank of the Pecos, in my opinion, is nothing more than a descriptive term and not a controlling term."  (Robillard Dep. 67).

68. There is no testimony that these metes and bounds constitute a "meander line," and, in fact, counsel for defendants stipulated that no such testimony would be offered.  (TR 315).  If the calls and distances do not constitute a meander line, they can only constitute a "boundary line," which conclusively establishes that the boundary line *is* the west bank.

69. The Court is in accord, having concluded, "I think the boundary is the bank, I think I made that pretty clear."  (TR 281:10-12).

70. The wording of the deed "is very specific as to the written intent of the parties and … the reference to the bank of the river means that the boundary is at the bank, not the river, and that ownership does not in any event go to the river or to the center of the river."  (Ex. 62 at 3). In this case, the language used shows the drafter intended that "the boundary is the bank where the course and distances line runs rather than the river itself."  (Robillard Dep. 52-53).

71. It is the opinion of both plaintiffs' experts, Doak and Robillard, and defendant's expert Chavez that the "East boundary of the property purchased by the United States Forest Service ….is the west bank of the Pecos River."  (Ex. 62 at 1, 3). Chavez reached this conclusion based on the deed from Kruger to the U.S., which stated the boundary was the west bank of the Pecos River.  (TR 288, Chavez Testimony).

72. Somehow, though it was never explained how, while Chavez concluded that the deed set the property *boundary* at the west bank of the river, Chavez opined that, despite this unambiguous boundary, the U.S. miraculously owned to the center of the river.  (TR 288, Chavez Testimony).  As there is no contention that the deed was based upon or recorded a meander line (statement of defense counsel, TR 315:20-23), and because the deed unambiguously states the west bank is the boundary, there is no way for the U.S' property to reach the centerline.

73. Indeed, Chavez (the Forest Service's surveyor) was criticized by the USFS' outside expert, James Simpson, for agreeing that the boundary of the USFS tract was the west bank of the river.  Simpson stated in an email to USFS counsel:  "Unfortunately, Chris Chaves' [sic] description stated *that the boundary was along the west bank*.  We should have him amend that -- let me discuss it with him, okay?"  (Ex. 79, emphasis added).

74. While criticizing Chavez' conclusion that the boundary of the Forest Service tract is the west bank of the river, Simpson testified to his own baseless conclusion that the boundary of the Forest Service tract is the medial line of the stream.   (TR 360, Simpson Testimony).   In reaching this "conclusion" Simpson has to simply ignore most of the language of the deed, including the lengthy verbiage setting forth a metes and bounds line and calling to corners.   He further ignores the testimony of Chavez that the metes and bounds line (and the fence line) ran along the west bank of the river, as it existed in 1942.   *See* TR 330-331, 343, Chavez Testimony (the metes and bounds line ran along the west bank of the Pecos river in 1942).   Simpson's interpretation, however, that the call to a monument controls *presumes* an ambiguity.   However, Simpson testified that the deed was *unambiguous*.   (TR 370-371, Simpson Testimony; TR 248-249).   The only way in which the deed can be unambiguous is to read it the way it was read by Doak, Robillard, and Chavez:  the metes and bounds, the calls to corners, and the wording "along the west bank of the river," all consistently bound the tract at the river's west bank.

75. In this case, "along the west bank means along the west bank, not in any event to the center of the river."  (TR 233, Doak Testimony).   The deed language reference to the west bank is limiting language that means exactly what it says -- the boundary is the west bank of the river. (TR 241-242, Doak Testimony).   This is consistent with the example of such limiting language set forth by plaintiff's expert, Walt Robillard, and agreed to by defense expert James Simpson (TR 364, Simpson Testimony):

> Q.   Now, your report in this case, Exhibit G, page 7, it says, "Mr. Robillard also argues that the word along as used in a description as thence along the road means along the center line or thread of the road unless qualified as, for example, along the east   side of the road.  That is correct."  You remember agreeing with that statement?
> A.   I'm trying to find it.  But I agree with it.
> Q.   Okay, sir.  It's on page 7, third paragraph, on Analysis of Report of Walter Robillard.

A.  Oh, yes, okay.  Yes.[2]

76. Chavez did not amend his report and testified to his conclusion that the USFS *boundary* was along the west bank of the Pecos River.  (TR 324-325, Chavez Testimony).

77. Similarly, USFS Regional Land Surveyor, Garland Burnett, responded to the Pecos District Ranger's "request for information regarding property line locations between lands owned by Mr. Kelly Shannon and the United States of America," (Ex. 45 at 1), by concluding:

> a. "The deed to the United States calls not for the center of the Pecos River, but the 'West Bank'.  That is the limiting call that tells us the Federal boundary is the west bank of the Pecos River and not the center line and the bearings and distances that follow are only informational as to where the west bank may have been at some point in time.  If the deed to the U.S. had stated, 'to the Pecos River,' or said, 'bounded on the east by the Pecos River.' [sic]  The property line would be the center of the Pecos River."  (Ex. 45 at 4-5).
>
> b. Burnett concluded:  "If asked to locate the property of the United States I would interpret the title line to be the mean high water mark of the West bank of the Pecos River."  (Ex. 45 at 5).[3]

78. Burnett did an investigation of title and boundaries before reaching these conclusions, did not take his task lightly, and was aware that because the opinion was issued by an agent of the USFS (Burnett), it carried some weight.  (TR 387, Burnett Testimony).

79. According to Chavez, a "boundary" is a "division line between two different owners." (TR 323).  As a result, Chavez testified:

> Q:      …. And is it true, sir, that the east boundary of the Tres Lagunas property purchased by the U.S. in 1969 is the west bank of the Pecos River?
>  A.  Yes, according to the deed, it is.
> Q.  Okay.  So that, at the west bank of the Pecos River, there is a property owner on the west and that's the U.S., correct?

---

[2] Simpson agreed that the use of road instead of a river makes no difference.  (TR 364-365, Simpson Testimony).
[3] Burnett testified that his conclusion had since changed, but he provided no explanation for this alleged change, other than to say he reviewed additional documents.  However, as Burnett apparently reviewed the salient document, the deeds in the chain of title, there is no explanation for why additional documents would have resulted in a different opinion.

A.  Correct.
Q.  And there is a property owner on the east, another property owner?
A.  Correct.
Q.  Okay.  And the dividing line is the west bank of the Pecos River?
A.  According to the deed.  (Id.).

80. Chavez concurred with Burnett that the metes and bounds description reflected that point where the west bank of the Pecos River stood at the relevant time.  (TR 330-331, Chavez Testimony).  *See also* TR 343, Chavez Testimony (the metes and bounds line ran along the west bank of the Pecos river in 1942).  *Accord* TR 244, Doak Testimony.  Chavez concluded that a 1946 survey completed by D.M. Daugherty, a licensed surveyor (TR 63, Shannon Testimony), showed the position of the fence that existed in 1946 which ran along the west bank of the river and was commensurate with the bearings and distances set forth in the Daugherty survey (which was the same as in the 1938 Ross survey).   (TR 330-331, Chavez Testimony).

81. The fence line shown on the 1946 Daugherty survey (Ex. 24), was along the metes and bounds line shown in the 1938 Ross Survey (Ex. 8).  (TR 330-331, 343, Chavez Testimony). At the time, the fence and metes and bounds were physically located along the west bank of the Pecos River.  (Id.; TR 251, 254, Doak Testimony).

82. The location of the fence in 1949 and the current location are virtually the same.  (TR 101-102, Shannon Testimony).

83. At no point in time did Shannon ever believe that he was trespassing in the area between the fence and the center of the river.  (TR 118, Shannon Testimony).

84. Shannon was never asked to take down any cables or other structures in the disputed area by any representative of the US.  In fact, he was told *not* to remove them.  (TR 118-120, Shannon Testimony).

85. In the event Shannon is told by the Court that he does not own to the west side of the river, he will voluntarily remove the cables.  (TR 121, Shannon Testimony).  As a result, the USFS will incur no costs.  (TR 352-353, Holliday Testimony).

86. Shannon has a lease arrangement by which he leases the rights to fish in the part of the river that he owns.  Most of that fishing occurs in the area north of the area in dispute in this litigation and is indisputably owned solely by Shannon.  (TR 122-123, Shannon Testimony).

87. Shannon has not made any profit on the lease arrangement.  (TR 122-123, Shannon Testimony).  There was absolutely no testimony establishing that Shannon caused any damages as the result of any alleged "trespass."

88. The USFS claims a right to 3% of the revenue Shannon made as a result of fishing the area between the centerline and the west bank of the River.  (Counterclaim).  The SFS did not produce any evidence establishing how often the part of the river claimed by the USFS was used as opposed to those parts of the Pecos owned entirely by Shannon.

## CONCLUSIONS OF LAW

1.  The Court has subject matter and personal jurisdiction over the parties. Venue is proper in this district.

### Boundary by Acquiescence and Quiet Title

2.  There is no necessity to prove that there is any dispute between the parties as to the boundary for the boundary by acquiescence doctrine to apply.  *See Sproles v. McDonald*, 70 N.M. 168, 372 P.2d 122 (1962); *Retherford, v. Daniell*, 88 N.M. 214, 539 P.2d 234 (Ct. App. 1975).  *See also Woodburn v. Grimes*, 58 N.M. 717, 275 P.2d 850, (1954) ("doubt, uncertainty,

or dispute as to location of true boundary is not essential in a boundary-by-acquiescence case…").

3.    Even if Innis and Shannon each owned up to a clear and certain line, a fence was built off of that line, and the fence rather than the land listed in the deed becomes the boundary by acquiescence.  *See Sproles v. McDonald, supra; McBride v. Allison*, 78 N.M. 84, 428 P.2d 623 (1967); *Retherford v. Daniell, supra; Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712 557 P.2d 209 (1976).

4.    The Innis family, and thereafter the Kruger Company, agreed (expressly and implicitly) that the true boundary of their property was the fence line that lay on the west side of the Pecos River.  The fence was the clear and certain dividing line and was mutually recognized as the boundary between the properties.  (*Tresemer v. Albuquerque Pub. School Dist*., 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

5.    The fence erected by Innis was recognized as the dividing boundary between the parties.  Both Innis and those later in his chain of title, and Shannon and those earlier in his chain of title, knew of the existence of the fence, establishing the boundary by acquiescence. (*Tresemer v. Albuquerque Pub. School Dist*., 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

6.    The fence, which was erected after litigation over property boundaries, was intended to provide a barrier between the properties.  When the fence was first erected, there was little or no livestock for it to restrain.  (*Tresemer v. Albuquerque Public School Dist*., 95 N.M. 143, 619

P.2d 819, 820 (N.M. 1980); *Sachs v. Board of Trustees of the Town of Cebolleta Land Grant*, 89

N.M. 712, 557 P.2d 209 (N.M. 1976)).

7.   Both Innis and Shannon knew of the establishment of the fence as the line of property

demarcation, both assented to this as the boundary line, and both instructed their family

members, guests, invitees, and others that the fence marked the boundary between the properties.

(*Tresemer v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980);

*Bloom v. Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of*

*Cebolleta Land Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

8.   The fence formed the boundary between the parties by acquiescence from at least

1942 through the time of the Forest Service's purchase of the property in 1969.   (*Tresemer v.*

*Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v.*

*Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land*

*Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

9.   Plaintiff has established that the boundary of his property is the fence line.   (*Tresemer*

*v. Albuquerque Pub. School Dist.*, 95 N.M. 143, 144, 619 P.2d 819, 820 (1980); *Bloom v.*

*Hendricks*, 111 N.M. 250, 254 (1991); *Sachs v. Board of Trustees of the Town of Cebolleta Land*

*Grant*, 89 N.M. 712, 719, 557 P.2d 209 (1976)).

10. Title shall be quieted in plaintiff to the area between his current property boundary

and the fence line, which runs along the west bank of the Pecos River on the metes and bounds

line established in the Ross Engineering survey.

11. Evidence of how the Forest Service treated the boundary is relevant to the issue, and

shows lack of ambiguity as to the boundary.   *Se, e.g., C.R. Anthony Company v. Dartford*

*Company*, 112 N.M. 504, 817 P.2d 238 (1991); *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 845

P.2d 1232 (1993); *Twin Forks Ranch, Inc. v. Brooks*, 120 N.M. 832, 907 P.2d 1013 (Ct. App. 1995).

### The USFS Boundary is the West Bank of the Pecos River

12. The U.S.' boundary is the west bank of the river, a conclusion that further bolsters the claim of boundary by acquiescence, establishing *why* the parties on both sides of the river treated the fence running along that bank as the boundary between the two properties.

13. The language of the deeds of conveyance in the Forest Service's chain of title are unambiguous and sets forth the metes and bounds line along the west bank of the Pecos River as the boundary of its property, which excludes the river.  11 C.J.S. Boundaries, § 30 at 87. ("definitely and specifically" binds the "conveyance by the bank of the stream that no process of interpretation will carry title to the center of the stream"); 12 Am.Jur.2d Boundaries § 24 (where conveyance "runs the boundary along the bank or shore of a river, land under water is excluded from the conveyance").  *See also Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co.*, 13 Haw. 583, 584 (Haw. 1901) ("one who owns land to the centre of a stream or inclusive of the whole stream may convey to another the portion of such land extending to the bank only and exclusive of the bed of the stream").

14. The terminology "along the west bank of the Pecos River," is a call requiring a finding that the intention of the original grantor was to establish the metes and bounds line along the bank of river, not the centerline of the river, as the property boundary.   (*See, e.g.*, 12 Am. Jur. 2d Boundaries §§ 24, 25; *Maestas v. Martinez*, 107 N.M. 91, 752 P.2d 1107 (1988); *Burnham v. Group One: City of Farmington*, 125 N.M. 129, 957 P.2d 1163 (Ct. App. 1998)). *See also Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co.*, 13 Haw. 583, 584 (Haw. 1901).

15. In New Mexico, "the intention of the parties 'as gathered from the four corners of the deed is the pole star of construction and … all parts of the deed must be examined together for purpose of ascertaining the intention."   *Atlantic Refining Co. v. Beach*, 78 N.M. 634, 637, 436 P.2d 107 (1968), *quoting Sharpe v. Smith*, 68 N.M. 253, 255, 360 P.2d 917 (1961).

16. Only by finding that the west bank of the river is the boundary can the Court give effect to all parts of the deed, including the courses and distances and calls to corners.

17. Each of the cases decided on this or similar issues are unique and limited to their facts.  This, in part, explains why the cases cited by the Court and the United States are inapposite to the facts of this case, most often because in this case, the deed language calls not "to a river" or "to a bank", but "to a corner."  Further, the deed language in this case clearly uses terminology meant to exclude the river as a boundary:  "along the west bank of the Pecos River." The other cases on which the Court and counsel relied do not use this terminology, or if similar terms are used, they are preceded by a call to the river itself:

    a. In *U.S. v. Goodrich Farms Partnership*, 947 F.2d 906 (10th Cir. 1991), the deed uses completely different language:  "[l]ying south of the Jackson Lake Inlet Ditch" and "lying north of the Jackson Lake Inlet Ditch" called for the ditch as the boundary.  This language is completely unlike that used in the deeds in this case.

    b. *Tagliaferri v. Grande*, 16 N.M. 486, 489 (1911), used the following language of conveyance:  "A parcel of land…bounded on the …west by the acequia of Barelas, the west boundary being the center of the said ditch or acequia of Barelas", conveyed to the center of the ditch.  This is far different language than was used in the deeds in this case.

c.  *Town of Newfane v. Druke*, 161 Vt. 222, 637 A.2d 1074 (1993) does not

include the deed language.  However, it appears that the deed did *not*

reference the *bank* of the stream, but either called "to the stream" or "along

the stream."  Neither of these are analogous to the deed in this case which has

a course and distance description that follows "along the west bank of the

river."

d.  In *Nilsson v. Latimer*, 218 Ark. 325, 664 S.W.2d 447 (1984), the deed

language repeatedly calls out "to" the bank, not "along" the bank.  This

difference is significant, because "to" is a call to the river itself.  In the deeds

at issue in this case, the only "to" call is "to a corner," not "to the river" or "to

the bank."

e.  The court in *Allen v. Morales*, 665 S.W.2d 851 (Tex. App. 1984), found that

the words in the deed "THENCE upstream along the right bank of the West

Fork of the Trinity River," because of its use of the word "upstream" meant

up the stream.  <u>Id</u>. at 854.  Further, unlike the conclusion of the court in this

case, the <u>Allen</u> court apparently concluded that the lines at issue were

"meander lines," which are "not considered as boundaries, but they are to

follow the general course of the stream, which in itself constitutes the real

boundary."  <u>Id</u>. at 852-853.  In this case, there are no meander lines, and Chris

Chavez (along with plaintiff's experts) concluded that the actual boundary is

the west bank of the river.

f.  *Cordova v. Town of Atrisco*, 53 N.M. 76, 201 P.2d 996 (1949), is not a case

involving a river or stream at all, but instead contains a call bounding the

property "on the west *by the hills*." Id. at 78 (emphasis in original). The Atrisco court's citation to Thompson on Real Estate (as testified to by all of the experts in this case) regarding the priority of calls is applied only when there is an *ambiguity*.[4] Nothing in Atrisco is remotely related to a deed using the language "along the west bank of the river;" rather, its facts would relate only to a deed using the words "by river."[5]

g. *Burnham v. Group One*, 1998-NMCA-56, 125 N.M. 129, also fails to use the language "along the west bank," or anything similar. The deed description "which is the nub" of the issue in *Burnham* dissimilarly states: "… running North and West *from the Animas River* as it now runs …" Id., ¶ 4 (emphasis added). Like the deeds discussed previously, this deed does not call for a boundary at a line that runs "along the west bank" of the river. Instead, the *Burnham* lines runs directly from the river itself, without any reference to the river's bank.

h. In *Terrill v. Tuckness*, 985 S.W.2d 97 (Tex. App. 1998), the "deeds called for possession to the 'middle of the creek.'" Id. at 100. Another part of a deed calls "THENCE West 388 varas ***to the East bank*** of Crabapple creek; THENCE down said creek with the meanders of its East bank." Id. at 103, emphasis added. The first deed portion quoted actually provides for possession to the river's centerline. The second quoted portion calls "to" the

---

[4] Further, the Thompson reference makes clear that when there are "marked corners …[and/or watercourses] found conformably to the calls" (in that case, of a patent), then "distances must be lengthened or shortened and courses varied so as to conform to those objects." Id. at 80.

[5] Similar criticism are applicable to several of the other cases relied on by defendants, such as Parr v. Worley, 93 N.M. 229, 599 P.2d 382 (1979) (land conveyed was "lying to the East of highway"); Nickson v. Garry, 51 N.M. 100, 179 P.2d 524 (1947) (conveyance of "the remaining 15 feet of said lot shall be perpetually reserved for an alley", conveyed to center of proposed alley); Gentile v. Crossan, 7 N.M. 589, 38 P. 247 (1894) (deed conveying "from the road to the hills" was ambiguous and therefore discussion of rules of construction followed).

bank; unlike this case, in which the deed never states "to" the bank, but only "*along* the west bank."   Further, the *Terrill* court apparently found the "meander" language significant, concluding that the appellees failed to overcome "the presumption that the meander calls set the boundary as the creek rather than the corner …." Id. at 106.  There is no meander line at issue in this case.

i.   The deed language in *Phillips Petroleum Co. v Threlkeld*, 123 F.2d 434 (10th Cir. 1941), is largely absent from the opinion, stating only it was an area "described by metes and bounds, containing 39,412 square feet, and lying west of block 2 and east of the east river bank." Id. at 435.  However, a description of land as lying "east of the bank" is far different from a description noting a boundary line that is "along the west bank of the river." The *Phillips Petroleum* court further found that only when there is a conflict in terms are rules of construction applicable.  If application of the rules is required, the court held that it was important to determine "the intent of the of the proprietor of the plat.  That may be shown in any proper way.  It may be established by the plat itself…." Id. at 437.   In this case, the plat itself demonstrates the intent that the west bank of the river, not its centerline, is the property boundary.

j.   In *Padilla v. City of Santa Fe*, 107 N.M. 107, 753 P.2d 353 (Ct. App. 1988), the deed described the property as "bounded on the south by the Santa Fe River .. and on the north 'by the hills.'" Id. at 108.  The latter description was

25

at issue.  A boundary "by the hills" or "by the river" or even "by the bank" is

a call to the centerline; that language is not at issue in this case.

k.   Neither *Kruger & Birch, Inc. v. DuBoyce*, 241 F.2d 849 (3d Cir. 1957), nor

*U.S. v. State Investment Co*., 264 U.S. 206 (1924), are applicable to the facts

of this case.  Both dealt with admittedly ambiguous deeds (or surveys, in the

case of *State Investment Co*., which is not the issue in this case.

18. Unlike the cases cited by the United States and the court in prior rulings, the cases

which use language like that of the deeds in this case have found that "along the west bank"

means just that: the boundary is "along the west bank," not the center of the river.  Chief among

these, and directly on point, is the decision in *Glover v. Giraldo*, 824 P.2d 552, 553-4 (Wyo.

1992).  There, the 1940 deed described the property as: "A tract of land in the West Half of the

Northwest Quarter (W 1/ 2 NW 1/4) of Section Twenty-three * * * containing all that portion

between the West Boundary line of the said subdivision and the North Platte River, more

particularly described as follows: …. Thence N.09 degrees 08'E. along the left bank of said river

a distance of 88.7 feet." The deed then references "along the left bank of said river" through

eleven more survey calls.   In construing this deed (which, like the deed at issue in this case,

contains both calls and distances and the term "along the left bank" of the river), the court

concluded:  "Where a deed contains references of both a general and particular nature, the

particular description is preferred and will control over or limit a more general description.  12

Am.Jur.2d Boundaries § 64 (1964).  The more particular references to 'the left bank of said

river' control and the grant must be interpreted as intending to convey only to the bank of the

North Platte River. This departure from the general rule is readily apparent from the face of the

deed and the specific language naming the bank as the boundary does not extend rights to the bed of the stream." Id. at 555, citation omitted.

19. Other cases using the actual "along the west bank" or similar verbiage are in accord. *See, e.g., Landon v. Clark*, 242 F. 30 (2d Cir. 1917) (deed which described boundary in part as "thence along the east shore of said pond" was bounded by the shore, where the court stated: "And the rule in New York is that where, in a deed, the land is described as bounded on the bank or shore of the stream, the grantee does not take title to the center, but the bank or shore is the monument, and not the stream …. In this respect the law of New York does not differ from what we understand to be the law elsewhere"). *See also Cole v. P. & L. E. R.R. Co.*, 106 Pa. Super. 436, 438, 445, 162 A. 712 (1932) (where, as in this case, deed uses both a metes and bounds description and reference to along the west bank ["thence, north sixty-four and one-half degrees west along the bank of the river …."], the bank is the boundary, and noting "the words 'along the banks' have been held to be *not synonymous* with 'low water mark,'" id. at 443); *Langevin v. Fletcher*, 273 Mass. 543, 174 N.E. 194 (1931) (deed describes land as running "Northerly on west line of … Sewall Street to the southerly bank of a brook", id. at 544, made the boundary the "top of the slope on the south side of that ravine," id. at 547, and nothing "A grant of land bounded by the bank of the stream ordinarily excludes the bed of the stream ….", id. at 546); *Cryer v. Sawkill Pines Camp, Inc.*, 88 Pa. Super. 71 (1926) (deed uses metes and bounds description and "*along the east bank of Sawkill Pond*," id. at 77 [emphasis in original], the use of the highlighted language shows "the intention that the line of the property conveyed should only run up to and along the edge of the bank and be bounded there by lands of Wallace, the owner of the pond," noting the difference between cases such as Cryer and the one before this Court in which a course is run along the bank or shore and those in which a line is run along the pond or

27

along the stream, only the latter of which convey to the center and the former of which convey only to the bank or shore, id. at 79); *Commissioners Comm'l Waterway Dist. No. 2 of King Cty v. Seattle Factory Sites Co.,* 76 Wash. 181, 194, 135 P. 1042, 1047 (1913) (noting, "where the description is specific in its language, naming the bank of the stream as the boundary of the land conveyed, we think the decided weight of authority is to the effect that the grantee's rights will not extend beyond such specified boundary so as to give him any right in the bed of the stream"); *Rockwell v. Baldwin*, 53 Ill. 19, 20, 22 (1869) (where the deed reads "…down the hill to the west side of Cedar creek, thence down the west line of said creek …" the boundary is the creek's west bank, and noting, "where, in a deed conveying land, the boundary is limited to the bank of the stream instead of bounding it on or along the stream, the presumption [that the boundary is the center thread of the stream] must fail.  The party must be controlled by the terms of his deed"). *Accord* 11 C.J.S. *Boundaries* § 30 ("It is recognized that a grantor may so definitely and specifically bound his conveyance by the bank of a stream that no process of interpretation will carry title to the center of the stream.  While always a question of construction, depending on the true intent of the parties as derived from a consideration of the whole instrument, a specific call in a description of the boundaries of land for the … bank … of a watercourse, pond, or lake or a for a point thereon, and thence along it, will, as a rule, be construed to limit the grant or conveyance to the … bank … as those terms may be defined in the particular jurisdiction, to the exclusion of the bed."

20. The U.S. admitted through Garland Burnett that the Forest Service "bought to the fence," and not to the river.  (TR 117-118, Shannon Testimony).  *See also* Ex. 45 (Burnett memo noting the U.S. property boundary ended at the west bank of the river). As a result, either the land from centerline to the fence belongs to Shannon by acquiescence, or it is unconveyed

remnant. *See, e.g,* Fed. R. Evid. 801(d)(2) (admission by party-opponent); *Wailuku Sugar Co. v. Hawaiian Commercial & Sugar Co*., 13 Haw. 583, 584 (Haw. 1901).

21. As it is the United States that has sought, by way of counterclaim that it owns from the centerline of the river to the river's west bank, the U.S. is in the position of a plaintiff with regard to the counterclaim.   "It is sufficient to conclude that the plaintiffs [in this case, counterclaimants] have not established title to any of the parcel allegedly taken" by Shannon. *Amaliksen v. United States*, 55 Fed. Cl. 167, 174-175 (Ct. Claims 2003).   In the event the Court determines that there is an unconveyed remnant, the Court need not ascertain to whom the property belongs.

22. "Bank" is defined as the mean high water mark.   (TR 250, Doak Testimony).   In Burham, 1998-NMCA-56, ¶ 26, the Court used this definition:  "The river's banks are defined as the 'boundaries which confine the water to its channel throughout the entire width when [a] stream is carrying its maximum quantity of water.'" Id., *citing* Black's Law Dictionary 1328 (6th ed. 1990).  *See also* TR 329, Chavez Testimony (the "bank" is the ordinary high water mark).

23. New Mexico law finds that the deed issued by the state effectively eliminates all prior deed history:  "the title received from the State is a new and paramount title in fee simple absolute."  *State ex rel. State Tax Comm'n v. Garcia*, 77 N.M. 703, 710 (N.M. 1967).  In 1936, near the relevant 1938-1939 time frame, the New Mexico Supreme Court held:

> The sale of the land under foreclosure of tax lien created a new and paramount title cutting off all prior liens, [e]ncumbrances and interests of every character.
>
> …. Indeed, it has been said that 'the prevailing opinion seems to be that a tax-title is a new title, and not merely the sum of old titles.' Generally a tax-title divests all interest in the land sold and vests in the grantee an independent and paramount title…..

*Alamogordo Improvement Co. v. Hennessee*, 40 N.M. 162, 164 (1936) (citations omitted).  *See also Bailey v. Barranca*, 83 N.M. 90, 92 (1971) ("It is held that a tax title is in the nature of a new and independent grant from the sovereign authority, and is a new and paramount title in fee simple absolute, *striking down all previous titles* and interests in the property…."); *Gore v. Cone*, 60 N.M. 29, 35 (1955) ("the tax deed from the State conveys to the purchaser… a new and paramount title to the lot, from the State; an independent and complete grant that extinguished all prior titles, interests and equities that were held by plaintiff, the defendant and every and all others that claimed or could claim any interest therein…."); *Zaring v. Lomax*, 53 N.M. 273, 277 (1949) (same).  As a result, Simpson's conclusion that once a medial line was created in a deed, it remained for all time is incorrect.  Regardless of whether a medial line existed, it was extinguished by the tax deed.

24. The U.S. has not stated a valid claim for trespass.  First, the U.S. has adduced no evidence that Shannon entered and remained on its "lands … after having been requested to leave."  NMSA § 30-14-1.1(A).  Nor has the U.S. adduced any evidence that Shannon's entry onto U.S. lands was "without prior permission."  Id. at (D).  Instead, the U.S. apparently invited Shannon onto the lands for some time, as evidenced by the U.S. permitting Shannon to erect his own "no trespassing" signs on the west bank of the river; the U.S. erecting its own signs on Shannon's behalf on the fence; the U.S. belief, as evidenced by its own surveyor, Garland Burnett, that the land did not belong to the U.S.; the U.S. permitting Shannon to erect signs on the roadway leading to the U.S. property; and its instructions to him *not* to remove anything from the stream pending the results of this litigation.

25. Further, there is no evidence that Shannon has damaged or destroyed any of the U.S. property.  The sole piece of testimony by the U.S. was that *if* Shannon was ordered to remove a

cable, and *if* he did not remove it, the U.S. would incur expenses for this removal. However, as Shannon testified he would remove the cable if so ordered, the U.S. agreed that this would incur *no costs*.  In the absence of proven damage, there can be no trespass for alleged damage.

26. Nor has the U.S. adduced a shred of evidence demonstrating that Shannon ever intended to trespass upon the property of another.  Quite the reverse.  Until immediately before the present litigation, both Shannon and the U.S. (and its predecessors) correctly presumed that the land belonged to Shannon in the first place.

### Costs and Fees

27. Plaintiff is entitled to recover his attorneys' fees spent in prosecuting this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or 42 U.S.C. § 1988.

28. As the prevailing party, plaintiff shall be permitted to recover the costs and expenses incurred in prosecuting this action pursuant to 28 U.S.C. § 1920, *et seq*. and 28 U.S.C. § 2412.

SIMONS & SLATTERY, LLP


By:    Electronically signed by Faith
Kalman Reyes, June 1, 2005
THOMAS A. SIMONS, IV
FAITH KALMAN REYES
Post Office Box 5333
Santa Fe, New Mexico  87502-5333
(505) 988-5600


### CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2005, a copy of the foregoing was sent via first class United States mail, postage prepaid, to Raymond Hamilton, Assistant U.S. Attorney, Post Office Box 607, Albuquerque, New Mexico  87103.

Electronically signed by Faith Kalman Reyes, June 1, 2005